## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **JOHN WALKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   Case No. _____ |
| | ) |
| **NEWMAN UNIVERSITY, INC.,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **KIMBERLY MCDOWELL-LONG,** | ) |
| **an Individual,** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT WITH JURY DEMAND

COMES NOW Plaintiff John Walker, and for his causes of action against Defendant Newman University and Kimberly McDowell-Long, states as follows:

### Jurisdiction and Venue

1.      Plaintiff alleges violations of Title IX of the Education Amendments of 1972 ("Title IX"), of Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), and Kansas common law.

2.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

3.      The Court has pendent jurisdiction over Plaintiff's state law claims because the claims arise and involve the same nexus of law and fact.

4.      Venue is proper with this Court pursuant to the provisions of 28 U.S.C. §1391(b) as the acts alleged in this Complaint were committed within this Judicial District.

## Parties

5.      Plaintiff John Walker (hereinafter "Walker" or "Plaintiff"), was employed at Newman University as the Counseling Program Director and Assistant Professor of Counseling.

6.      Defendant Newman University, Inc. (hereinafter "Newman"), is a private college located at 3100 McCormick St., Wichita, Kansas, and is incorporated in the State of Kansas.

7.      Defendant Kimberly McDowell-Long, (hereinafter "Defendant Long" is the Provost & Vice President for Academic Affairs at Newman University.

8.      Defendant Newman is an educational institution and is a recipient of federal financial assistance.

9.      Defendant Newman is an employer within the meaning of Title VII, the ADA and the ADAAA.

## Administrative Exhaustion

10.      On October 31, 2018, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission.

11.      Plaintiff intends to request a notice of right to sue from the EEOC on Plaintiff's Charge of Discrimination when the government shut-down ends and the EEOC resumes normal operations.

12.      Plaintiff fully intends to meet all conditions precedent necessary for his claims under Title VII and the ADA/ADAAA.

## Background Facts

13.       Plaintiff began his employment with Newman in August 2008 as an Adjunct Professor of Counseling.

14.      In May, 2014, Plaintiff was promoted and appointed to a tenure-track position as

2

Counseling Program Director and Assistant Professor of Counseling. The 2018-2019 academic year was to be his final year required to achieve tenure.

15.     Plaintiff's duties and responsibilities encompassed both administrative and faculty job duties, including but not limited to program administration, program development, administration of program budgeting/projections, hiring of faculty, program accreditation, course/program development and assessment, administration of all in-field (practicum) learning environments and community outreach, program recruitment, all student advising, and 4/4 course instruction.

16.     Beginning in the fall of 2014, Plaintiff provided Newman with volunteer services including but not limited to Faculty Senate Salary & Benefits Committee Chair, Title IX Compliance taskforce member, Title IX Confidential Resource for students and employees and Title IX Investigator.   He also served as the only licensed clinical behavioral health representative of the Behavioral/Threat Assessment & Intervention Team member. He maintained these volunteer roles throughout the duration of his employment at Newman University.

17.     Plaintiff also provided volunteer services to the professional community in Kansas and in the surrounding local communities.

18.     Plaintiff spent three years (2014-2017) developing and authoring a new bachelor of social work program (BSW). In February 2017, Plaintiff formally proposed the bachelor of social work (BSW) program and "counseling-to-bachelor-social-work program conversion plan" for institutional approval. In May, 2017, the proposed BSW program, plan for program conversion, and the proposed programing budget/implementation plan achieved full institutional approval (Faculty, Administration, and the Board of Trustees (BOT)).  Following the May, 2017

BOT approval, Plaintiff was to receive a promotion and title change to BSW Program Director, a salary increase, and was to hire a second full-time faculty member beginning June 2017.

19.     During his employment at Newman, Plaintiff received consecutive positive recommendations for his retention as a faculty member and Program Director and received praise for his commitment to program development, teaching, advising and service.

20.     Plaintiff received an institutional letter of recommendation, recommending his retention for the 2017-2018 academic year.  Plaintiff received and signed his 12-month faculty contract for the 2017-2018 academic year (May, 2017- May, 2018) on or about March 7, 2017.

21.     Plaintiff received his institutional letter of recommendation for retention for the 2018-2019 academic year (dated June 19, 2017).

22.     At all times relevant, Plaintiff met or exceeded the expectations for his job.

23.     At all times relevant, Newman has had an Equal Employment Opportunity/Non-Discrimination Policy which extends to employment practices, conditions of employment, personnel actions and all other educational programs or activities of the University.  Newman's policy also prohibits retaliation against any person who brings an accusation of discrimination or who assists with the investigation or resolution of discrimination.

24.     At all times relevant, Newman has had a Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy which prohibits retaliation for filing, testifying, assisting or participating in any investigation or proceeding involving allegations of sex discrimination, sexual harassment or sexual misconduct.

25.     At all times relevant, Newman has had a Whistleblower Protection Policy which prohibits retaliation against any employee who in good faith reports an ethics violation, a suspected violation of the law, such as a complaint of discrimination, suspected fraud, illegal

activity or suspected violation of any regulation governing the operations of Newman University.

26.     Newman is responsible for enforcing these policies and ensuring that its employees are adequately trained to follow these policies.

27.     Newman's Title IX Coordinator was a staff member, Case Bell.

28.     Plaintiff was one of several Title IX investigators at Newman.

29.     Beginning June 2017, Plaintiff's direct supervisor was Fr. Joseph Gile, Dean of Graduate Studies and Adult and Continuing Education.

30.     Additional Newman officials involved in the conduct giving rise to this lawsuit are believed to include the following individuals: Noreen Carrocci, President of Newman University; Victor Trilli, Athletic Director & Vice President for Student Affairs; Jennifer Gantz, Vice President for Finance & Administration; and Icer Vaughn, Chief Information Officer.

31.     Newman's employees were operating within the scope of their employment at all times relevant with regard to the events described herein.

32.     On August 4, 2017, Plaintiff became aware that the employee Fr. Gile and his selection committee had chosen for the Master of Social Work program position had misrepresented her qualifications and experience which was a possible violation of K.S.A. 65-6303 and K.A.R. 102-2-7. Plaintiff, who is a Licensed Specialist Clinical Social Worker in the State of Kansas, and is required by law to report possible violations to his employer and to the Kansas Behavioral Sciences Regulatory Board, informed Fr. Gile about what he had discovered. Fr. Gile became furious, refuted Plaintiff's report, and required Plaintiff to "prove it" to him. Plaintiff then provided the available Council on Social Work Education (CSWE) accreditation requirements and State of Kansas BSRB statutes and regulations to Fr. Gile, at which point Fr. Gile apologized.

33.     On August 29, 2017, Plaintiff was assigned to investigate a Title IX complaint filed with the institution that alleged a supervisory employee of Newman had engaged in inappropriate sexual relationships with student employees and that she had made unwelcomed sexual advances toward her subordinate employee.

34.     Plaintiff concluded the investigation on August 31, 2017, and Newman appropriately instituted the recommended corrective action with respect to this complaint.

35.     On October 4, 2017, a Newman employee filed a Title IX discrimination complaint with the institution ("Clark Complaint"). The Title IX complaint alleged that an officer of the corporation, Vic Trilli (Vice President of Student Affairs and Athletic Director), and several Newman University employees (former and current coaches of the men's basketball team) had engaged in sex discrimination, harassment and retaliation against the complainant. The allegations also included threats made against the complainant by a student employee (and former men's basketball athlete). The allegations included discriminatory actions beginning in the fall of 2015 and continued uninterrupted at the time the complaint was filed in October 2017.

36.     On October 9, 2017, Plaintiff was assigned to investigate the Clark Complaint. Lisa DeLoach was also assigned as a secondary investigator-in-training.

37.     During the months of October and November 2017, Plaintiff conducted interviews of the complaining party and witnesses regarding the Clark Complaint.  During the course of this investigation, witnesses disclosed to Plaintiff additional incidents of discrimination and retaliation that had occurred, many of which had not been reported or properly investigated pursuant to Newman's policy and procedures.

38.     On October 18, 2017, Plaintiff met with Dean Fr. Gile to discuss department issues, including inequities of faculty pay and Plaintiff's outstanding overload pay.  Fr. Gile

"tabled" the conversation and agreed to schedule a meeting with Defendant Long and Plaintiff regarding the issues.

39.     From October 18 – 23, 2017, Plaintiff corresponded with Fr. Gile to follow up with the pay inequity and overload pay issues.

40.     On October 28, 2017, members of the Newman baseball team hosted an off-campus Halloween party that many Newman students and athletes attended.  Alcohol and drugs were present at the party, and early the next morning, a young woman who had attended the party and was found deceased in her vehicle.

41.     Following the report of this untimely death, Newman officials controlled all aspects of the investigation into this death.

42.     On November 3, 2017, Plaintiff met with Fr. Gile to discuss BSW implementation, budget access, BSW faculty hiring, pay and salary inequity issues. Fr. Gile again "tabled" the issues to take them to Long.  When Plaintiff expressed his concerns about retaliatory treatment at Newman, Fr. Gile became angry, accused him of "fishing for information" and ended the meeting.

43.     On November 6, 2017, Plaintiff learned that his supervisors had left private, sensitive and confidential personnel documents and emails about Plaintiff between Fr. Gile and Long and two other administrators in public view, near the third-floor printer in McNeill Hall. These personal and confidential documents were spread out and intermingled with other printouts and had been left in public view of faculty, staff and students for several days.

44.     On November 7, 2017, Plaintiff complained to Human Resources that he was being subjected to a hostile work environment and retaliation since he had been assigned the investigation of the Clark Complaint about Trilli, the basketball coaches and the student.

45.     On November 13, 2017, as he was investigating the Clark Title IX Complaint, Plaintiff became concerned about retaliation from Trilli toward the Dean of Students, who had been assigned as the Complainant's supervisor as an interim measure in the Clark Complaint, and encouraged him to protect his rights.

46.     On November 13, 2017, a recording from an anonymous person was slid under the locked door to Plaintiff's office.

47.     On November 14 and 15, 2017, Plaintiff interviewed Trilli for the Clark Complaint.

48.     On November 14, 2017, Dean Esses filed a Title IX complaint against Trilli for retaliation. ("Esses Complaint").  Plaintiff was assigned to investigate the Esses Complaint.

49.     Between November 15 and December 1, 2017, Plaintiff continued to conduct interviews of witnesses for the Clark Complaint.

50.     On or about November 16, 2017, two more complaints alleging sexual harassment and retaliation against other employees were filed by a student employee. ("Student Complaints"). The complaining party reported that she was being retaliated against for speaking with Plaintiff and repeatedly questioned about the information she shared with him in the confidential investigation.

51.     On or about November 16, 2017, during the course of his investigation, Plaintiff discovered that Trilli was hiding knives in his office safe that he had confiscated from a prior harassment and assault complaint involving student athletes.

52.     On November 20, 2017, Trilli admitted that he confiscated the knives before police could talk to the perpetrator.

53.     Plaintiff met with a Newman Board of Trustees member, Sister Vicki Bergkamp,

on November 21, 2017 with respect to his concerns of retaliation and interference by Newman administrators.

54.     Sometime after 6:00 pm on November 21, 2017 and before 8:00 am on November 22, 2017, an unauthorized entry into Plaintiff's office was made and evidence related to the investigation was stolen from his office. The anonymous recording and evidence relating to the sexual discrimination and retaliation investigations had been removed from his office during the break-in.  Plaintiff immediately reported the unauthorized entry and theft to Newman's Director of Security.

55.     On November 21 and 22, 2017, Plaintiff was unable to log into his Newman email account and he learned that his password had been    administratively    "reset"    without    his knowledge.

56.     Newman officials had knowledge on November 27, 2017 that Plaintiff's office had been entered and that a CD and other file materials had been stolen from his office.

57.     On November 27, 2017, Plaintiff had a telephone conversation with Board President Teresa Hall-Bartels during which he provided her with a synopsis of each of the four open Title IX investigations (the Clark Complaint, the Esses Complaint and the Student Complaints), information about the harassment and assault matter involving the knives stored by Trilli on campus, information about retaliation against witnesses interviewed for the Clark Complaint, interference and confidentiality breaches in the Title IX investigations by administrators at Newman, and threats from the Athletic Department that "snitches end up in ditches with stitches."  Hall-Bartels stated to Plaintiff that he was to "find the truth."

58.     On November 27, 2017, after interviewing a Title IX witness, Plaintiff contacted the homicide detective at the Wichita Police Department with respect to the criminal

investigation into the young woman's untimely tragic death. He reported that he knew of a witness to the events that evening and that in the interest of the timeline of the events, he wanted to make the detective aware.  Plaintiff also shared with the detective that students were afraid to come forward with information about the untimely death.

59.     On November 28, 2017, during an interview with Clark Schafter, Plaintiff learned that President Carrocci had approved an article in the Newman University magazine prominently featuring the student employee alleged to have made threats in the Clark Complaint.

60.      On November 28, 2017, Plaintiff's network password was again reset and a "new policy" related to securing employee email was created by Defendant Long and the CIO, Icer Vaughn.

61.     On November 29, 2017, Plaintiff had a telephone conversation with Board President Hall-Bartels in which he shared his concerns regarding the security of Newman's network and preservation of electronic data and video evidence.

62.     On December 1, 2017, Plaintiff interviewed another witness to the Clark Complaint, who disclosed that certain administrators and coaches, including those accused of wrongdoing, had been conducting their own independent investigations into sexual harassment and discrimination complaints, concealing evidence and intimidating witnesses.

63.     On December 1, 2017, while Plaintiff was waiting to interview another witness for the Clark Complaint, who was a no-show, a file containing personal items, typed reports and documents was removed from behind a file cabinet in his office. Plaintiff reported the unauthorized entry and theft of this file to Newman's Director of Security on December 2, 2017. The Director of Security stated nothing had been reported to him or turned in.

64.     After the no-show on December 1, 2017, Plaintiff learned that the Newman Board

of Trustees and Executive Committee had removed him as the investigator into the Title IX complaints and from the Title IX task force, and had retained the Lewis, Brisbois, Bisgaard & Smith, LLP law firm to conduct an independent investigation into the ongoing Title IX matters.

65.     Plaintiff spoke with Hall-Bartels again on December 4, 2017 with respect to the contradictions Newman was facing as a college founded to educate and empower women to transform society, and Hall-Bartels encouraged Plaintiff to use the Whistleblower policy to voice his concerns.

66.     On December 11, 2017, Plaintiff met with attorneys from Lewis and Brisbois regarding the investigations.

67.     On December 12, 2017, Plaintiff learned that the file stolen from his office on December 1, 2017 was found outside the library in the Dugan Conference Center by another employee of Newman on the morning of December 4, 2017, and that it had been provided to Gantz and Carrocci. When Plaintiff asked Carrocci and Gantz if they had possession of the materials stolen from his office, they denied having possession of the file.

68.     On December 12, 2017, Plaintiff then learned from the Director of Security that Carrocci and Gantz had instructed the Director to lie about his possession of the file stolen from his office, that the stolen file had been found on December 4, 2017, and that Newman Board Member Fr. Tom Welk had instructed Security not to give Plaintiff his personal items that had been stolen from his office.

69.     While working at Newman on January 4, 2018, Plaintiff became aware that his position at Newman had been posted to the University's employment website and listed as "open." Plaintiff sent an email asking for clarification to Defendant Long, the Provost and Vice President of Academic Affairs.

70.     At 3:50 pm on January 4, 2018, Long responded to Plaintiff and stated in an email that he was "… no longer an active member of the teaching faculty."

71.     At approximately 4:15pm on January 4, 2018, Plaintiff received correspondence at his Newman email account from Alan Rupe and Jeremy Schrag at Lewis, Brisbois, Bisgaard & Smith, LLP, notifying him that he would not have any teaching duties for the spring semester, that his employment would not be renewed, effectively terminating his employment with Newman. The correspondence also stated that he was not to come on campus and that he was not to have contact with faculty, staff or students.

72.     Immediately following Defendant Long's email to Plaintiff on January 4, 2018, Long proceeded to hold multiple impromptu meetings with faculty and staff in each of Newman's academic buildings on campus. During these meetings, Long stated to faculty and staff that Plaintiff was an "active security threat" and instructed that anyone who saw Plaintiff on campus was to immediately call the police.

73.     Long also stated to employees and staff at Newman that she "was not in a position to evaluate [Plaintiff's] mental and emotional state but that there were people at the university that were qualified to do that assessment" and that "they determined that [Plaintiff] was a risk," so she was "acting on their assessment."

74.     Not long after her systematic spreading of false information about Plaintiff, a staff member was heard saying they would be "sitting ducks" if Plaintiff came on campus with a gun.

75.     Between January 4, 2018 and January 10, 2018, Long continued to disseminate information to Newman employees that Plaintiff was an active security threat.

76.     Additionally, Newman University officials placed "mug shot" pictures of Plaintiff around the Newman campus with instructions to contact the police if he was seen on campus.

77.     Between January 4, 2018 and January 10, 2018, the Newman campus was placed on heightened security lock-down.

78.     On January 7, 2018, Newman cancelled its January 8, 2018 Winter Institute due to concerns by faculty and staff that Plaintiff posed a threat to them.

79.     On or about January 9, 2018, President Carrocci told a group of Newman employees that Plaintiff had never been a security threat and that the accusation was false.

80.     On January 10, 2018, Newman boxed and delivered Plaintiff's personal office belongings to his home, and included with the delivery confidential Newman student files.

81.     On January 19, 2018, Plaintiff appealed his termination following his removal from the Title IX investigations after raising concerns about the behavior of Newman's leadership and Newman's compliance with the law and Title IX, and sought relief from the false, defamatory and malicious statements made by Defendant Long.

82.     On or about February 13, 2018, Alan Rupe of the Lewis Brisbois law firm, counsel for Newman, responded that Plaintiff's allegations did not warrant a reply.

83.     Plaintiff continued to pursue the appeal of his termination with Newman but was denied the ability to do so.

84.     On or about May 14, 2018, Plaintiff received correspondence from Newman University notifying him of his termination, effective May 31, 2018.

85.     Plaintiff was subjected to retaliation as a consequence of his participation and opposition to discrimination and retaliation at Newman.

86.     Plaintiff's employment was terminated in retaliation for his participation and opposition to discrimination and retaliation at Newman.

87.     Plaintiff was terminated in retaliation for his participation in and opposition to the

discrimination and retaliation of individuals by Newman University's officers, employees and students.

88.     Plaintiff openly opposed, resisted and confronted the discriminatory and retaliatory conduct.

89.     Plaintiff was forced to step outside his role as the investigator to actively assist and support other employees in asserting their rights to be free from sexual harassment, discrimination and retaliation.

90.     The statements made and published by Long damaged his reputation and caused him damage.

91.     Plaintiff was subjected to discrimination based on a perceived disability that he had a mental impairment.

92.     Since his termination, Plaintiff has not been able to find comparable employment and has suffered lost wages, income and benefits.

93.     Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, depression, and loss of enjoyment of life; has suffered and continues to suffer damage to his reputation, with attendant emotional distress, embarrassment, disgrace, humiliation, loss of enjoyment of life, and impairment of his career prospects; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; has incurred and will continue to incur expenses for medical and psychological treatment, as well as other economic hardships; and attorneys fees and costs.

## COUNT I
### (Liability under Title IX for Retaliation)
### (Defendant Newman)

94.     Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

95.     Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 and its implementing regulation 34 C.F.R Part 106 prohibit discrimination based on sex and prohibit retaliation against any individual who has made a complaint, testified, or participated in any manner in an investigation into alleged noncompliance with Title IX. *See* 34 C.F.R. § 100.7(e).

96.     Employees of federally funded educational institutions who raise complaints, or participate in investigations, concerning compliance with the substantive provisions of Title IX are protected from retaliation by 34 C.F.R. § 100.7(e) and enjoy an implied private right of action for money damages to vindicate their rights.

97.     Plaintiff has a federal statutory right under Title IX to be free from retaliatory action for protected participation or opposition under Title IX in a federally funded educational facility.

98.     Plaintiff was entitled to raise complaints concerning noncompliance with Title IX, to oppose discrimination and retaliation, and to participate in investigations concerning the alleged violations of Title IX and likewise was entitled to the protection against retaliation.

99.     Defendant Newman had actual and/or constructive knowledge and notice of the sexual harassment or discrimination complaints alleged herein.

100.    Defendant Newman, through its employees and agents, ignored or disregarded Title IX's mandate for equal educational opportunities.

101.    Plaintiff engaged in a protected activity under Title IX when he participated in the

investigations and opposed interference by Newman administrators and encouraged others to assert and protect their rights.

102.    After receiving reports of the alleged discrimination, harassment and retaliation, Defendant Newman, by and through its employees and agents, retaliated against Plaintiff for opposing discrimination and retaliation at Newman and for participating in the investigations.

103.    Plaintiff suffered adverse actions as a result of his protected activity when Defendant took away significant duties and responsibilities, and ultimately terminated him.

104.    Defendant Newman, through its employees and agents, demonstrated deliberate indifference to Title IX's mandates for equal educational opportunities and anti-retaliation for protected activity.

105.    The aforesaid occurrences were the direct and proximate result of the negligence and carelessness of Defendant Newman and its employees and agents while acting within the scope and course of their employment.

106.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, and attorneys fees and costs.

107.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain expenses for medical and psychological treatment, as well as other economic hardships.

108.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain damages for lost pay and benefits in an amount commensurate with her compensation at Newman.

109.    Defendant's indifference and resulting action was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being, justifying the imposition of punitive damages.

**COUNT II**
**(Retaliatory Discharge for Whistleblowing)**
**(Defendant Newman)**

110.    Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

111.    Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare.

112.    As a licensed social worker in the State of Kansas, Plaintiff has an obligation to report violations of the law to the Kansas Behavioral Sciences Regulatory Board (BSRB) as it pertains to social workers.

113.    Plaintiff reported what he reasonably believed to be infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare to his supervisor Fr. Gile in August and continuing into November 2017.

114.    Plaintiff reported what he reasonably believed to be infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare to the President of Newman's Board, Teresa Hall-Bartels in November and December 2017.

115.    Plaintiff reported what he reasonably believed to be criminal theft at Newman to the Director of Security on November 21, 2017 and again on December 2, 2017.

116.    Plaintiff reported what he reasonably believed to be information about a material witness and witness intimidation concerning the criminal investigation into the suspicious and

tragic untimely death of the young woman at the baseball party.

117.    It is the public policy in the State of Kansas to encourage employees to report theft and criminal activity.

118.    A reasonably prudent person would conclude that the Newman officials identified by Plaintiff were engaged in activities that violated rules, regulations, or the law pertaining to public health and safety and the general welfare.

119.    A reasonably prudent person would conclude that criminal theft or attempted theft is a violation of the law.

120.    Newman had knowledge that Plaintiff reported what he reasonably believed to be activities that violated rules, regulations, or the law pertaining to public health and safety and the general welfare prior to his discharge.

121.    Plaintiff's whistleblower reports were done in good faith based on concern regarding the wrongful activity reported.

122.    Plaintiff was discharged in retaliation for making his reports.

123.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, and attorneys fees and costs.

124.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain expenses for medical and psychological treatment as well as other economic hardships.

125.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain damages for lost pay and benefits in an amount commensurate with his compensation at Newman.

## COUNT III
### (Defamation)
### (Defendants Newman and Long)

126.    Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

127.    Defendant Long made publications in January 2018 to third parties, including the false and misleading statements which are more fully set out in the Background Facts.

128.    These publications contained false statements of fact that Plaintiff was a security threat due to a mental and emotional assessment.

129.    Defendant Long made these false statements with knowledge that they were untrue or with reckless disregard for whether the statements were true or false.

130.    Defendant's statements to the Newman community and other third parties were not privileged.

131.    Defendant's statements to the Newman community and other third parties were not true, and were not opinions.

132.    Defendant's statements tended to expose Plaintiff to contempt and ridicule.

133.    Defendant acted negligently with respect to these statements or made them with actual malice.

134.    As a result of Defendant's defamatory statements, Plaintiff suffered damage to his reputation.

135.    As a result of Defendant's defamatory statements, Plaintiff suffered actual damages.

136.    Defendant Long's statements were made in the course and scope of her employment with Defendant Newman.

137.    Defendant Long's conduct was done with the participation, ratification, authority and consent of Defendant Newman.

138.    Defendant Newman is vicariously liable for such statements.

139.    Defendants' actions were reckless, for which punitive damages are appropriate.

140.    As a result of the above-described acts, Plaintiff has suffered, and continues to suffer damage to his reputation, with attendant emotional distress, embarrassment, disgrace, humiliation, and loss of enjoyment of life.

## COUNT IV
### (Invasion of Privacy)
### (Defendants Newman and Long)

141.     Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

142.    Defendant Long made publications in January 2018 to third parties, including the false and misleading statements suggesting Plaintiff was a security threat due to a mental and emotional health assessment which are more fully set out in the Background Facts.

143.    These publications placed Plaintiff in a false light before the Newman community and public at large.

144.    Defendant Long's statements tended to expose Plaintiff to contempt and ridicule.

145.    The publicity was highly offensive to Plaintiff as to a reasonable person.

146.    Plaintiff's perceived mental health is not of a legitimate concern to the public.

147.    Defendant Long's statements to the Newman community and other third parties were not privileged.

148.    Defendant Long's statements to the Newman community and other third parties were not true, and were not opinions.

149.    Defendant Long's statements were made in the course and scope of her employment with Defendant Newman.

150.    Defendant Long's conduct was done with the participation, ratification, authority and consent of Defendant Newman.

151.    Defendant Newman is vicariously liable for such statements.

152.    Defendants' actions were reckless, for which punitive damages are appropriate.

153.    As a result of the above-described acts, Plaintiff has suffered, and continues to suffer damage to his reputation, with attendant emotional distress, embarrassment, disgrace, humiliation, and loss of enjoyment of life.

## COUNT V
### (Liability under Title VII for Retaliation)
### (Defendant Newman)

154.    Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

155.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e) *et seq,* prohibits discrimination based on sex and prohibits retaliation against any individual who has made a complaint, testified, or participated in any manner in an investigation into alleged noncompliance with Title VII.

156.    Plaintiff has a federal statutory right under Title VII to be free from retaliatory action for protected participation or opposition under Title VII.

157.     Plaintiff is protected under Title VII from retaliation for opposing sexual harassment and retaliation of complainants and witnesses.

158.     Plaintiff was entitled to raise complaints concerning noncompliance, to oppose discrimination and retaliation, and to participate in investigations concerning the alleged violations of Title VII and likewise was entitled to the protection against retaliation.

159.     Defendant Newman had actual and/or constructive knowledge and notice of the sexual harassment or discrimination complaints alleged herein.

160.     Plaintiff engaged in a protected activity under Title IX when he participated in the investigations and opposed interference by Newman administrators and encouraged others to assert and protect their rights.

161.     After receiving reports of the alleged discrimination, harassment and retaliation, Defendant Newman, by and through its employees and agents, retaliated against Plaintiff for opposing discrimination and retaliation at Newman and for participating in the investigations.

162.     Plaintiff suffered adverse actions as a result of his protected activity when Defendant took away significant duties and responsibilities, and ultimately terminated him.

163.     The aforesaid occurrences were the direct and proximate result of the negligence and carelessness of Defendant Newman and its employees and agents while acting within the scope and course of their employment.

164.     As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, and attorneys fees and costs.

165.     As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain expenses for medical and psychological treatment, as well as other economic hardships.

166.     As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain damages for lost pay and benefits in an amount commensurate with his compensation at Newman.

167.     Defendant's indifference and resulting action was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being, justifying the imposition of punitive damages.

<u>COUNT VI</u>
**(Liability under the ADA/ADAAA for Discrimination)**
**(Defendant Newman)**

168.     Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

169.     The Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA") prohibits discrimination based on disability or perceived disability against any individual in his employment.

170.     Plaintiff has a federal statutory right under the ADAAA to be free from discrimination based on a perceived disability.

171.     Defendant regarded Plaintiff as having a mental impairment.

172.     Plaintiff was terminated from his employment at Newman because Defendant wrongly perceived him as having a mental impairment which created a threat to his colleagues and students.

173.    Plaintiff was able to perform the essential functions of his job at the time Defendant terminated his services as an employee.

174.    Plaintiff's perceived disability played a part in the defendant's decision to terminate his employment.

175.    Plaintiff suffered adverse action as a result of the perceived disability when Defendant terminated him.

176.    The aforesaid occurrences were the direct and proximate result of the negligence and carelessness of Defendant Newman and its employees and agents while acting within the scope and course of their employment.

177.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, and attorneys fees and costs.

178.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain expenses for medical and psychological treatment, as well as other economic hardships.

179.    As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain damages for lost pay and benefits in an amount commensurate with his compensation at Newman.

180.    Defendant's indifference and resulting action was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being, justifying the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court conduct a jury trial on his claims, enter judgment in his favor in an amount above the jurisdictional amount and against Defendants, grant such declaratory and injunctive relief as is necessary and appropriate to remedy the wrongs alleged herein; award Plaintiff actual damages, compensatory damages, punitive damages, reasonable attorneys' fees and expenses; and grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable by law.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the place of trial for this matter.

Respectfully submitted,

BROWN & CURRY, LLC

/s/Sarah A. Brown
Sarah Brown, KS #12130
Dan Curry, KS #22750
Erin N. Vernon,  KS#24590
406 W. 34th Street, Suite 810
Kansas City, MO 64111
(816) 756-5458
(816) 666-9596 (FAX)
sarah@brownandcurry.com
dan@brownandcurry.com

ATTORNEYS FOR PLAINTIFF